UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION

| | |
|---|---|
| AMANDA KAY RENFROE, INDIVIDUALLY AND AS THE NEXT FRIEND OF S.W.R. | PLAINTIFF |
| V. | CIVIL ACTION NO. 3:18-CV-609-DPJ-LRA |
| ROBERT DENVER PARKER AND RANDALL TUCKER | DEFENDANTS |

CONSOLIDATED WITH

| | |
|---|---|
| THE ESTATE OF MICHAEL WAYNE RENFROE AND AMANDA KAY RENFROE | PLAINTIFFS |
| V. | CIVIL ACTION NO. 3:19-CV-396-DPJ-LRA |
| ROBERT DENVER PARKER AND SHERIFF RANDALL TUCKER | DEFENDANTS |

ORDER

Plaintiff Amanda Renfroe seeks relief from the final judgments dismissing her consolidated excessive-force, wrongful-death cases. Mot. to Set Aside Final Judgments [70]. After considering Plaintiff's arguments and examining her new evidence, the Court is not persuaded that the judgments should be set aside; the motion is therefore denied.

I.  Facts and Procedural History

Defendant Robert Denver Parker, a Madison County Sheriff's Deputy, shot Plaintiff's husband, Michael Renfroe (Renfroe), on June 8, 2018, around 10:00 p.m. Seconds before the fatal shooting, Renfroe ran toward Parker and refused to stop when Parker deployed his Taser.

Much of what happened can be seen on Parker's dashcam video, and the audio recorded the rest. The details of the encounter are described in the analysis offered below.

On August 22, 2019, the Court granted Defendants' summary-judgment motion on the federal claims and dismissed the state-law claims under 28 U.S.C. § 1367(c)(3). Order [65]; Judgment [66]. It then denied Plaintiff's July 5, 2019 Motion to Alter Judgment. Order [63]. Plaintiff timely appealed, and on September 10, 2020, the Fifth Circuit affirmed. About five months after the Court granted summary judgment, Plaintiff received Renfroe's autopsy report— which was completed on January 1, 2020. Plaintiff then retained a previously undisclosed forensic pathologist, who issued an expert report on March 23, 2020. Shortly thereafter, on April 10, 2020, Plaintiff filed her motion to set aside the final judgments under Federal Rules of Civil Procedure 60(b)(2), 60(b)(3), and 62.1.[1] The gist of Plaintiff's argument is that the 2020 autopsy and subsequent expert report provide evidence "that there was no physical altercation between Parker and Michael Renfroe"—evidence she claims would have made a difference had it been known before the Court entered its judgments. Pl.'s Mem. [71] at 4.

II.     Analysis

Federal Rule of Civil Procedure 60(b) provides in relevant part:

On motion and just terms, the court may relieve a party or its legal representative from a final judgment, order, or proceeding for the following reasons:

. . . .

(2) newly discovered evidence that, with reasonable diligence, could not have been discovered in time to move for a new trial under Rule 59(b); [or]

(3) fraud (whether previously called intrinsic or extrinsic), misrepresentation, or misconduct by an opposing party . . . .

---

[1] Rule 62.1 applies where an appeal "has been docketed and is pending." Because the appeal is no longer pending, Rule 62.1 is not relevant.

The Fifth Circuit Court of Appeals has "consistently held that the 'relief under Rule 60(b) is considered an extraordinary remedy . . . and that the desire for a judicial process that is predictable mandates caution in reopening judgments.'" *In re Pettle*, 410 F.3d 189, 191 (5th Cir. 2005) (punctuation altered) (quoting *Carter v. Fenner*, 136 F.3d 1000, 1007 (5th Cir. 1998)). Thus, "[c]ourts are disinclined to disturb judgments under the aegis of Rule 60(b)." *Pease v. Pakhoed Corp.*, 980 F.2d 995, 998 (5th Cir. 1993). Whether circumstances justifying relief exist "lies within the sound discretion of the district court." *Edwards v. City of Hous.*, 78 F.3d 983, 995 (5th Cir. 1996) (en banc). With that in mind, the Court will separately address Plaintiff's arguments under Rule 60(b)(2) and Rule 60(b)(3).

    A.     Rule 60(b)(2)—Newly Discovered Evidence

Plaintiff says the 2020 autopsy report, photographs of Renfroe's wounds, the diagram of those wounds, and her subsequently obtained expert report "are new evidence which show that defendant Robert Parker was not in a physical altercation with Michael Renfroe." Pl.'s Mem. [71] at 2. She therefore seeks relief under Federal Rule of Civil Procedure 60(b)(2).

To obtain relief under Rule 60(b)(2), "a movant must demonstrate: (1) that it exercised due diligence in obtaining the information; and (2) that the evidence is material and controlling and clearly would have produced a different result if present before the original judgment." *Goldstein v. MCI WorldCom*, 340 F.3d 238, 257 (5th Cir. 2003). Significantly though, "[t]he newly discovered evidence must be in existence at the time of trial and not discovered until after trial." *Longden v. Sunderman*, 979 F.2d 1095, 1102–03 (5th Cir. 1992). "A motion under this rule is an extraordinary motion, and the requirements of the rule must be strictly met." *Id.* at 1102.

       1.  Whether the Evidence Is Newly Discovered

The parties superficially dispute whether the evidence is "newly discovered." Defendants say none of it existed when the Court entered the judgments, and Plaintiff argues that excluding the evidence would be unfair. There's more to it. To begin, Defendants are certainly correct that the two reports were generated post-judgment. But the Court could still consider the reports if they are based on facts that existed before the judgments that Plaintiff could not have discovered until after the judgments.

That happened in *Chilson v. Metropolitan Transit Authority*, where the plaintiff filed a Rule 60(b)(2) motion based on a post-judgment internal audit revealing a $2.6 million overpayment. 796 F.2d 69–70 (5th Cir. 1986). The Fifth Circuit noted that the overpayment existed before judgment and then considered "whether it [wa]s the audit or what the audit reveal[ed] that [wa]s the evidence." *Id.* at 71. The court concluded that "[w]hen the concern is of materiality and relevance, what is critical is the content of the evidence, not the form in which it comes. . . . [T]herefore, . . . the district court was in error in deciding as a matter of law that the $2,600,000 overpayment revealed by the internal audit was not newly discovered evidence." *Id.* at 72.

Applied to the 2020 autopsy report, both the photographs of Renfroe and the June 13, 2018 autopsy diagram were created before judgment. And because Plaintiff exercised reasonable diligence to obtain that evidence, it may be considered under Rule 60(b)(2). *Id.* So too, any physical evidence revealed in the autopsy report, like the angle of the bullet wounds, reflects pre-existing facts that may be considered. *Chilson*, 796 F.3d at 72.

Plaintiff's expert report is more difficult to assess because her expert relied on a mix of previously known and newly discovered evidence. Notably, a party may not submit an expert

4

report under Rule 60(b)(2) if the evidence upon which the report is based was available before judgment.  *See, e.g.*, *Johnson-Williams v. Mortg. Elec. Registration Sys., Inc.*, 696, 401 F. App'x 369 (5th Cir. 2017) (holding that expert report was not newly discovered evidence because plaintiff could have discovered supporting facts before judgment).

Here, Dr. Michael M. Baden, a forensic pathologist from New York, opines that "Parker was not in a physical altercation with Mr. Renfroe."  Baden Report [70-4] at 5.  Dr. Baden bases that opinion on the following facts:  (1) dashcam video shows Renfroe pulling his left arm across his chest after Parker deployed his Taser; (2) photographs of Renfroe's wounds show that a bullet passed through Renfroe's left wrist and into his torso, thus proving his left arm never moved for the seven off-camera seconds between Taser deployment and the shooting; (3) the Taser report reveals that Parker's "hand [wa]s on the Taser trigger for five seconds" leaving "no time for a struggle to occur"; (4) the autopsy report concludes that the shots were fired from more than two feet away; and (5) photographs of Parker reveal no injuries.  *Id.* at 3–4.

It seems at least arguable that a previously discovered fact could become relevant only when coupled with newly discovered evidence.  For example, Plaintiff had the dashcam video showing Renfroe reach for his chest with his left arm, but without the diagram of the wounds, the expert would be unable to reach his opinion that Renfroe's left arm remained in that position until he was shot.  Other evidence, like the Taser report and photographs of Parker, was previously disclosed and requires no new evidence for context.  That leaves the difficult question whether the Court can parse the legitimate and illegitimate aspects of the expert report, something neither party addresses.  Rather than explore those potentially tricky issues *sua sponte*, the Court finds that even considering Plaintiff's "new" evidence, it is not material.

2.      Whether the Newly Discovered Evidence Is Sufficient

To obtain relief, Plaintiff must show her new evidence "*clearly* would have produced a different result if present before the original judgment." *Goldstein*, 340 F.3d at 257. To meet that test, Plaintiff primarily relies on Renfroe's wounds and the expert opinion that there was never a physical altercation. But none of that would "clearly" change the result because even absent a physical altercation, Parker's use of force was appropriate given the dashcam video and Parker's undisputed testimony that Renfroe was moving toward him when Parker fired his sidearm.

The video shows Parker's police cruiser approaching a white pickup truck on a dark and secluded road at about 10:18 p.m. Parker was alone, and there is no dispute he was responding to a suspected burglary. As Parker brought his cruiser to a stop several car lengths from the truck, Renfroe exited the driver's side, naked from the waist up. Though Parker would not have known it at the time, Plaintiff later reported that Renfroe was "experiencing delusions and exhibiting strange behavior that day." Baden Report [70-4] at 4.

The behavior on the video is certainly strange. After exiting his truck, Renfroe initially dropped to all fours in the middle of the road staring at Parker. Suddenly, Renfroe jumped up and rushed Parker, running toward the dashcam. Parker claims in unrebutted testimony that Renfroe yelled, "now, M . . . F . . . , let's do this." Parker Decl. [17-1] ¶ 13. When Renfroe reached the front bumper of Parker's cruiser, Parker deployed his Taser, but Renfroe never stopped. There is no dispute the Taser was ineffective, and "[t]here was no Taser barb injury." Baden Report [70-4] at 5.

What happened next occurred off camera, but two seconds after Renfroe ran through the Taser, the dashcam video jostles as someone can be heard bumping into the cruiser. At the same

6

time, the audio captures audible grunts, thuds, and other noises consistent with an altercation. Those sounds last about four seconds, followed by two seconds of silence before the first shot. The timing of the silence corresponds with Parker's claim that he freed himself, moved back, and shot Renfroe as he attacked again.

Significantly, Plaintiff has never offered evidence contradicting Parker's statement that Renfroe was advancing when Parker fired the first shot; her newly discovered evidence does not clearly refute that conclusion. Looking first to the autopsy photographs and diagram, they show four shots entering (and in some cases exiting) Renfroe's chest, arm, wrist, and shoulder near his clavicle. Plaintiff's argument highlights the following photograph showing the wound near the top of Renfroe's clavicle. Pl.'s Mem. [74] at 5.



She claims that because his wound is located "more towards Michael's back than the front," it proves Parker did not shoot in self-defense. *Id.*[2]

To begin, Parker stated that he separated himself from Renfroe after being attacked and shot as Renfroe again advanced toward him. Consistent with that, Plaintiff's expert opined that

---

[2] This photograph was imbedded in Plaintiff's memorandum but does not appear to be an exhibit docketed in the record.

"[a]ll gunshot wounds proceed from front to back and left to right." Baden Report [70-4] at 4. There is no evidence Parker shot Renfroe in the back. As for the one wound near Renfroe's clavicle, Plaintiff has not established the succession of shots. Perhaps that wound came from the final shot as Renfroe fell forward. Indeed, the abrasions on the front of his body would further support that assumption.

That said, it is not the Court's responsibility to determine how that wound occurred. "Rather, if a Rule 60(b)(2) motion were to succeed, it would be the plaintiffs' heavy burden to demonstrate to the district court how this newly discovered evidence is 'material and controlling and clearly would have produced a different result if presented before the original judgment.'" *Goldstein*, 340 F.3d at 258 (quoting *N.H. Ins. Co. v. Martech USA, Inc.*, 993 F.2d 1195, 1201 (5th Cir. 1993)).

Without more, the wound near Renfroe's clavicle fails to clearly conflict with Parker's claim that Renfroe was moving toward him when the shot was fired. Nor does that wound negate the fact that Renfroe can be seen on the video rushing toward Parker and refusing to stop even after Parker deployed his Taser. Plaintiff has not shown that this photograph—or any other—"*clearly* would have produced a different result if present before the original judgment." *Goldstein*, 340 F.3d at 257 (emphasis added).

Plaintiff makes a similar argument based on the downward trajectory of the wounds, claiming that they prove Parker did not act in self-defense. Pl.'s Mem. [71] at 5; Pl.'s Reply [74] at 3. But again, she fails to adequately establish—with evidence—why that would be so. *Goldstein*, 340 F.3d at 258. The downward trajectory of the wounds is compatible with Parker's account and does not diminish what happened before he fired. *See Guerra v. Bellino*, 703 F.

App'x 312, 315 (5th Cir. 2017) (finding no excessive force in fatal shooting where some bullet wounds had a "steeply downward angle").

Plaintiff's other major point—supported by Dr. Baden's report—is that no physical altercation ever occurred.  But even if factually correct, that argument fails because Parker was not required to wait for a physical attack, and it remains unrefuted that Renfroe was moving toward Parker when the shots were fired.  The question, therefore, is not whether a physical altercation occurred but whether a reasonable officer would view Renfroe as "a threat of serious harm to the officer."  *Manis v. Lawson*, 585 F.3d 839, 843 (5th Cir. 2009).

The facts here are eerily like those in *Guerra v. Bellino*, where Officer Bellino made a nighttime stop of Guerra, an apparently intoxicated suspect who "was stumbling, walking through traffic, and wearing pants but no shirt."  703 F. App'x at 314.  Video of the encounter showed Guerra "mov[ing] rapidly in Bellino's direction," but the parties disputed whether Guerra was trying to run at Bellino or past him.  *Id.* at 315.  In either event, Bellino opened fire. *Id.*  As in this case, there was "[n]o evidence of close[-]range firing."  *Id.*  And though Guerra never touched Bellino—it was not clear he would have—the Fifth Circuit found that "[a] reasonable officer in Bellino's position could have concluded that Guerra posed a threat of serious harm."  *Id.* at 317.

The same is true here.  As described above, Parker "had mere seconds to assess the potential danger."  *Renfroe v. Parker*, No. 3:18-CV-609-DPJ-LRA, 2019 WL 2410084, at *4 (S.D. Miss. June 7, 2019) (quoting *Kisela v. Hughes*, 138 S. Ct. 1148, 1153 (2018) (reversing denial of qualified immunity)), *amended in part*, No. 3:18-CV-609-DPJ-LRA, 2019 WL 3806641 (S.D. Miss. Aug. 13, 2019), *aff'd*, 974 F.3d 594 (5th Cir. 2020).  Renfroe rushed Parker on the video, and even ignoring the audible confrontation, he was moving toward Parker when

9

the shots were fired. Dr. Baden's opinion does not "*clearly*" change the finding that a reasonable officer would view Renfroe as a threat to their safety, even if he did not first hit or choke the officer. *Goldstein*, 340 F.3d at 257 (emphasis added). In fact, the Court's summary-judgment Order reached that same conclusion, noting that even if Plaintiff had substantiated her version of the facts, "the video still establishes that a reasonable officer would have been in fear of death or serious physical harm." *Renfroe*, 2019 WL 2410084, at *4. The new evidence would not change the results because the alternative ruling already assumed what Plaintiff now hopes to prove.[3]

---

[3] It is "self evident" that "newly discovered evidence [must] be both admissible and credible." *Provident Life & Acc. Ins. Co. v. Goel*, 274 F.3d 984, 1000 (5th Cir. 2001). Dr. Baden's report is neither. For starters, Dr. Baden offers no methodology or testing to support his opinions. *See Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 593 (1993). Some opinions also contradict or ignore the dashcam video. *See Scott v. Harris*, 550 U.S. 372, 380 (2007) (holding that district court should have rejected plaintiff's testimony because it conflicted with videotape surveillance footage). For instance, Dr. Baden opines that when Renfroe was shot, his left arm was in the "exact position" as when he was tasered seven seconds earlier. Baden Report [70-4] at 3. From that, he concludes that Renfroe never moved his left arm after the Taser deployed, and he further assumes that this proves no physical altercation occurred. *Id.* Yet the video shows Renfroe's left arm starting to move away from his chest in the split second between the failed Taser deployment and when Renfroe runs out of the camera's view. And for all anyone knows, Renfroe could have moved his left arm after being unsuccessfully tasered and then raised it again seven seconds later when Parker pointed his gun or fired. The opinion that he never moved his left arm for those seven seconds is rank speculation unsupported by any data or methodology. And even assuming Dr. Baden is correct that Renfroe kept his left arm in the same position for those fatal seven seconds, the expert provides no explanation—much less testable analysis—for concluding that it proves no physical altercation ever occurred. How, for example, does Dr. Baden know that Renfroe did not hit Parker with his right arm or otherwise cause the impact with the cruiser seen and heard on the video? And as to that impact, Dr. Baden simply ignores when the dashcam video jostles, followed by four seconds of sounds consistent with an altercation. Similarly, Dr. Baden provides no analysis for his opinion that there was no time for a "struggle" because Parker's hand remained on the Taser trigger for five seconds. *Id.* The audio clearly proves there was time for a struggle—you can hear it—and it seems obvious that Renfroe could have assaulted Parker while Parker held the Taser. If Dr. Baden wishes to opine otherwise, then he needs to support it with something other than his own say so. A jury is just as qualified to make the assumptions he offered as opinion. Finally, Dr. Baden's report relies on statements from Plaintiff Amanda Renfroe. *See id.* at 4. Noticeably absent is a statement that no physical altercation occurred though she was facing the cruiser just feet from the shooting. These are just examples, but had the Court concluded that Dr. Baden's opinions were material, they would still fall short on admissibility and credibility.

10

Finally, even assuming Parker violated Renfroe's rights, Plaintiff has never identified a sufficiently relevant case that would have put Parker on notice that he was violating clearly established law, and *Guerra* would suggest otherwise. *See Kisela*, 138 S. Ct. at 1153 (reversing denial of qualified immunity where facts did not fit clearly established law). The 2020 autopsy report and expert report do not "clearly" change that result either. *Goldstein*, 340 F.3d at 257.

B. Rule 60(b)(3)—Fraud

To have a judgment set aside under Rule 60(b)(3), "the complaining party must 'establish by clear and convincing evidence (1) that the adverse party engaged in fraud or other misconduct and (2) that this misconduct prevented the moving party from fully and fairly presenting his case.'" *General Universal Sys., Inc. v. Lee*, 379 F.3d 131, 156 (5th Cir. 2004) (quoting *Montgomery v. Hall*, 592 F.2d 278, 278–79 (5th Cir. 1979)). "Misconduct may be shown by evidence that the opposing party withheld information called for by discovery or willfully committed perjury." *Id.* at 157. Plaintiff argues that she is entitled to relief under Rule 60(b)(3) because new evidence reveals "Parker's demonstrably and clearly false claim that Parker was physically assaulted and choked with both hands by Michael Renfroe." Pl.'s Mem. [71] at 13.

According to Plaintiff, her new evidence—including Dr. Baden's opinion that no physical altercation occurred—contradicts three statements Parker made about Renfroe's use of his hands. *Id.* First, she references the statement Parker gave to the Mississippi Bureau of Investigation, in which he stated:

> The subject continued trying to grab me with both hands around my neck. . . .[4] I then fired 4 shots towards the subject as he was actively running towards me. I observed that the subject began falling down, holding his chest and I ceased fire.

---

[4] Plaintiff inserted this ellipsis, thereby deleting Parker's description of the altercation and his statement that he freed himself from Renfroe and stepped back before shooting. The Court mentions this because the quote, as written in Plaintiff's brief, would be internally inconsistent.

11

Pl.'s Mem. [71] at 13 (quoting MBI Report [71-1] at 2). Next, she describes deposition testimony in which Parker stated that the only weapon Renfroe used against him was "his hands." Parker Dep. Excerpt [71-2] at 2. Finally, she references Defendants' description of the shooting in their summary-judgment brief:

> At first, Deputy Parker moved behind his vehicle door and tried to hit Michael with the door, but Michael came around the door and started trying to choke Deputy Parker with his hands. Deputy Parker then tried to strike Michael in the face with his fists, but Michael deflected Deputy Parker's attempts and continued to assault Deputy Parker, still placing his hands around Deputy Parker's throat and also hitting him on the side of the head.

Mem. Excerpt [71-3] at 2.

There are two problems with Plaintiff's argument. First, contrary to her characterization of these passages, they are not so at odds with the record to clearly establish that Parker "willfully committed perjury." *General Universal*, 379 F.3d at 157. It must again be noted that Parker's statements relate to events that happened in a matter of seconds. Order [46] at 3. Moreover, and more significantly, Parker's account of a physical altercation was supported by the visible jostling of his vehicle "when Michael apparently reached Parker" as well as sounds of "an audible struggle" in the background of Parker's dashcam recording. *Id.* at 2. Dr. Baden's expert opinion that there was no physical altercation never addresses this evidence and is not "clear and convincing evidence" of willful perjury. *General Universal*, 379 F.3d at 156.

Second, and perhaps more significantly, even assuming Renfroe never touched Parker, the video speaks for itself and Parker's statement that Renfroe was advancing toward him when Parker shot has not been refuted. "A reasonable officer in [Parker's] position could have concluded that [Renfroe] posed a threat of serious harm." *Guerra*, 703 F. App'x at 317.

Plaintiff disputes that, arguing that the Court premised its original summary-judgment order on the false assertion that "Parker was assaulted and choked with both hands by Michael

12

Renfroe."  Pl.'s Mem. [71] at 13.  But as noted above, that is not so.  Plaintiff made this same argument in her summary-judgment response, contending that a question of fact existed whether Renfroe hit Parker.  *See* Order [46] at 8.  The Court found that Plaintiff had not created a question of fact on that point but alternatively held that "even assuming she is correct [that Renfroe did not hit Parker], the video still establishes that a reasonable officer would have been in fear of death or serious physical harm."  *Id.*  Parker's alleged misstatements did not, therefore, prevent Plaintiff from "fully and fairly presenting [her] case."  *General Universal*, 379 F.3d at 156 (citation omitted).  Plaintiff has not shown the type of fraud required to obtain relief under Rule 60(b)(3).[5]

III.     Conclusion

The Court recognizes that this was a tragic night for Renfroe's family and appreciates counsel's dedicated efforts to revive this case post-judgment.  But a reasonable officer in Parker's shoes that night would have feared serious injury or death.  For the foregoing reasons, Plaintiff's Motion to Set Aside Final Judgments [70] is denied.

**SO ORDERED AND ADJUDGED** this the 28th day of October, 2020.

s/ *Daniel P. Jordan III*
CHIEF UNITED STATES DISTRICT JUDGE

---

[5] Dr. Baden also notes in his report that according to the autopsy, "Renfroe was more than two feet away from the muzzle of the gun when it was discharged and that they were not in physical contact."  Baden Report [70-4] at 3.  That opinion supports Parker's account.  Parker has always said—including on the dashcam recording—that he was able to break free from Renfroe and step back before shooting.  *See* Dashcam Video [40-2] at 5:19, 8:49; Parker MBI Interview [71-1] at 2.  His contention finds further corroboration in the audio.  As stated earlier, the confrontation between Parker and Renfroe can be heard starting two seconds after Parker deploys his Taser, and it lasts for about four seconds.  Then, there are roughly two seconds of silence before the first shot.  That silence corresponds with Parker's testimony that he backed up before firing.

13